DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

KAREN BEAUSEY (CABN 155258)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6598
    FAX: (415) 436-7234
    Karen.Beausey@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. |
|     Plaintiff, ) | |
|     v. ) | **VERIFIED COMPLAINT FOR FORFEITURE** |
| $36,800 in United States Currency, ) | ***IN REM*** |
|     Defendant. ) | |

The United States of America, by its attorneys, David L. Anderson, United States Attorney, and Karen Beausey, Assistant United States Attorney for the Northern District of California, brings this complaint and alleges as follows:

**NATURE OF THE ACTION**

1. This is a judicial forfeiture action, as authorized by Title 21, United States Code, Section §§ 853 and 881(a)(6), involving the seizure and forfeiture to the use and benefit of the United States of America the following property:

$36,800 in United States Currency seized by law enforcement officers from Obah Jamar POPE

1

on or about October 11, 2018, and currently in the custody of the United States Drug Enforcement Administration ("DEA");

(hereinafter, "Defendant Property"), as property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of a violation of 21 U.S.C. §§ 841 and/or 846, and thereby forfeitable pursuant to 21 U.S.C. §§ 853 and 881(a)(6).

## JURISDICTION AND VENUE

2. This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355, and 21 U.S.C. § 881(a)(6).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 because the acts or omissions giving rise to the forfeiture occurred in this district and the Defendant Property is located in this district.

4. Intra-district venue is proper in the San Francisco within the Northern District of California.

## PARTIES

5. Plaintiff is the United States of America.

6. The Defendant Property consists of $36,800 in United States Currency seized by law enforcement officers from Obah Jamar POPE on or about October 11, 2018, and currently in the custody of the DEA.

## FACTS

7. On October 11, 2018, Cincinnati DEA Task Force Agent Eli Sautter received information from a confidential source (CS) that on October 11, 2018, Obah POPE had made a one-way reservation to fly from Richmond International Airport in Richmond, Virginia to San Francisco International Airport (SFO) on October 11, 2018 (the same day), via American Airlines. POPE's travel originated at Richmond International Airport, with a layover at Charlotte Douglas International Airport in Charlotte, North Carolina, before continuing to San Francisco aboard American Airlines flight #785. POPE's

flight to SFO was scheduled to arrive at 10:09 a.m. The CS also reported that POPE had paid $578.30 for the ticket with a credit card via an outside travel agent, and that he had one checked-in piece of luggage. TFO Sautter, in turn, passed that information to San Francisco DEA Task Force #2 at SFO.

8. Task Force #2 officers conducted a computer records check of POPE and learned that he had been arrested in 2014 in Nevada for trespassing. Task Force #2 conducted a search of POPE's social media and located POPE's Instagram account. That account included several publicly available posts/photos of POPE, including one (which was dated July 2018) of POPE next to a car counting a large amount of U.S. Currency, one (dated May 2018) of POPE with a large sum of U.S. Currency in his lap, and one (dated December 2013) of a large bag filled with marijuana.

9. In light of the information related to them by TFO Sautter and the pictures they had observed in POPE's Instagram account, San Francisco Task Force #2 officers decided to meet POPE at SFO and to seek an interview with him regarding the purpose of his travel to California.

10. Accordingly, on October 11, 2018, at approximately 10:15 a.m., TFO Blake Molyneux other Task Force #2 agents established surveillance at the American Airlines luggage carousel in anticipation of the arrival of passengers from American Airlines Flight #785. At approximately 10:30 a.m., passengers began to arrive at the luggage carousel. At approximately 10:35 a.m., Task Force officers observed a subject they believed to be POPE, based on viewing his photograph earlier that day and upon his physical descriptors, arrive at the luggage carousel. TFO Molyneux noticed POPE was carrying a black backpack. POPE stopped directly where the luggage first enters the carousel and waited for luggage to arrive. At approximately 11:01 a.m., POPE retrieved a blue hard-sided rolling suitcase from the carousel. TFO Molyneux noticed POPE was able to pick the suitcase up with very little effort, as if the suitcase did not contain much contents or any heavy items. POPE paused for a moment and then began to walk toward the exit of the terminal.

11. At approximately 11:03 a.m., as POPE walked toward the exit, agents approached POPE

to conduct a consensual encounter. TFO Molyneux called to POPE by saying, "Mr. POPE." POPE stopped and turned his attention to TFO Molyneux. POPE could have ignored TFO Molyneux and walked another 15 feet to an exit door that leads to the curbside if he wanted. TFO Molyneux, and TFO Steve Maes, who were both dressed in plain clothes, not uniforms, and were not visibly displaying firearms or other weapons, approached POPE and identified themselves as agents with the Drug Enforcement Administration and law enforcement by displaying their issued credentials. TFO Molyneux asked POPE if they could speak to him and POPE said, "Sure." TFO Molyneux advised POPE he was not under arrest and that he was free to leave at any time, which POPE appeared to understand. TFO's Molyneux and Maes were standing at a conversational distance from POPE, not blocking his path of travel, and were speaking in calm, normal voices. Throughout the interview POPE had a clear, unobstructed path to walk away from the agents if he chose to do so. No other agents were present at the time of the conversation.

12. TFO Molyneux asked POPE if he was traveling alone and POPE stated he was. POPE stated he arrived at SFO from Richmond, Virginia. TFO Molyneux asked POPE if he currently resided in Virginia or California, and POPE said he resided in California. TFO Molyneux asked POPE his reason for traveling to Virginia, and POPE said he had gone to Virginia to visit a cousin. TFO Molyneux asked POPE where his cousin resided, but POPE would only say "in Virginia" without providing any further information. While speaking to POPE, TFO Molyneux noticed POPE appeared to be exceptionally nervous. When TFO Molyneux asked follow-up questions, POPE was unable to provide any details about his trip and was very vague when offering responses. As the contact went on, POPE began to sweat profusely even though it was a mild temperature in the luggage carousel area. POPE was sweating so severely by the end of the contact that he had to continually wipe the sweat away from his head and face.

13. TFO Molyneux explained to POPE that he and TFO Maes were a part of a task force

4

attempting to control the drug trafficking trade through the use of airports. TFO Molyneux asked POPE if he was carrying any drugs or anything illegal, and POPE said he was not. TFO Molyneux asked POPE if he had ever been arrested before and POPE denied he had ever been previously arrested. TFO Molyneux knew this not to be true as the computer check of POPE's criminal history had already revealed POPE had been arrested for trespassing in Arizona in 2014. TFO Molyneux asked POPE for his consent to search his luggage. In response, POPE said, "Yeah, go ahead." POPE then stepped back, away from his blue hard-sided rolling suitcase, which TFO Molyneux understood to be a further indication of his consent.

14. Based on POPE's consent, TFO Maes began to search POPE's checked-in rolling suitcase. Upon opening POPE's suitcase TFO Maes noticed there was no clothing in the suitcase. In fact, there was nothing in the main compartment of POPE's suitcase at all. However, TFO Maes noticed there was something under the lining of the suitcase. TFO Maes inspected the object under the lining and noticed the object was a pillow case. TFO Maes looked inside the pillowcase case and saw numerous stacks of rubber banded U.S. Currency. TFO Maes asked POPE for his consent to search his black backpack (which POPE was still wearing) and POPE said, "yeah," removed the black backpack, and handed it to TFO Maes. TFO Maes searched POPE's black backpack and located one stack of rubber banded U.S. Currency in the inner pocket of the black backpack. TFO Molyneux, now seeing the stacks of U.S. Currency that had been in POPE's blue hard-sided rolling suitcase and the stack of money from POPE's black backpack, asked POPE how much money he had with him. POPE said he had a couple thousand. Based upon the volume of money TFO Molyneux believed POPE's estimate was a gross underestimate of the total, and asked if POPE could give a better estimate. Throughout the subsequent conversation TFO Molyneux asked POPE several more times how much money POPE was carrying, and POPE responded repeatedly that he did not know the total amount of money in his possession. Later in the contact, POPE modified his answer and stated he was carrying $17,000, and at

another point later in the conversation POPE changed his estimate to $38,000, but even then he stated he was not sure of the total.

15.     In his training and experience, TFO Molyneux recognized the manner in which the currency was packaged as consistent with narcotics smuggling. Specifically, the bundling of the money in rubber-banded stacks and the concealment of the money within the lining of luggage were methods of transporting money that TFO Molyneux had observed used by narcotics traffickers in other investigations in which he had worked.

16.     TFO Molyneux asked POPE why he had so much money with him, and POPE stated he sold a car while in Virginia. TFO Molyneux asked POPE why he did not mention selling the car prior to the agents finding the money in his possession or when asked about his reason for traveling to Virginia. POPE replied that he sold the car to his cousin so he did think it was important to say he sold a car.

17.     TFO Molyneux again asked POPE about his trip to Virginia. POPE said he went to visit his cousin and sold him a car for $17,000. TFO Molyneux asked POPE for further details about the car, but POPE could only say it was an Audi. POPE said he did not have a bill of sale and did not have any DMV paperwork with him regarding the car. TFO Molyneux asked POPE if the car was his car, and POPE said it was, but when TFO Molyneux said he could find out information about the car later POPE changed his story and said the car was not in his name. TFO Molyneux asked POPE who the listed owner of the car was before he sold it, but POPE would not provide a name. TFO Molyneux stated POPE could not sell a car if it was not in his name, and POPE stammered a few incoherent words and tried to change the subject. TFO Molyneux asked POPE how he got the car to Virginia, and POPE thought for a minute before saying his cousin drove the car to Virginia. TFO Molyneux asked POPE how he got to Virginia and POPE said he flew while his cousin drove the car from California. TFO Molyneux asked POPE for his cousin's name and telephone number so he could confirm with his cousin that POPE sold him a car, but POPE refused to provide any information regarding his cousin.

18. TFO Molyneux believed the large volume of cash TFO Maes had recovered from POPE's checked suitcase totaled much more than $17,000, and it appeared to TFO Molyneux that POPE was not accounting for all of the money in his possession. TFO Molyneux asked POPE where the rest of the money came from. POPE responded that he also sold some shirts while in Virginia. TFO Molyneux asked POPE how many shirts he sold and how much money he made selling the shirts. POPE, without providing exact details for either question, said the rest of the money in his possession was from selling shirts. Per POPE's later estimate that he had $38,000 in his possession, that would mean he sold $21,000 worth of shirts while in Virginia. TFO Molyneux asked POPE if he made more than $20,000 selling shirts. POPE, hearing the total, seemed to want to say he got the money some other way, but did not provide another explanation and said that is what he must have made. TFO Molyneux asked POPE how many shirts he sold, and POPE said "all of the shirts [he] brought with [him]" and that was why his suitcase was empty. Notably, POPE's suitcase also did not contain any pants, undergarments, shoes, toiletries, sundries, or any of the other items people usually take with them when they travel. TFO Molyneux asked POPE how many shirts he took to Virginia, but POPE could not provide a number. TFO Molyneux asked POPE how much he sold each shirt for, but POPE could not provide a price per shirt. POPE claimed to be just starting his shirt selling business. TFO Molyneux asked if he worked for a company or for himself, and POPE said he worked for himself. However, POPE said did not have any business cards or anything related to a shirt selling business (or to any business at all). POPE also said he did not have a business name. TFO Molyneux asked POPE where his business paperwork was if he sold shirts while on his trip (for example, bills of sales, a business license, tax paperwork, etc.), but POPE said he did not have any paperwork with him.

19. TFO Molyneux asked POPE about his finances. POPE did not always provide clear answers when asked financial questions. POPE could not provide an estimate of his income for the past year. In fact, POPE could not provide any information about any employment at all. POPE could not

7

provide a reason as to why he lied about the total amount of money in his possession, and could not provide a reason as why he did not know the exact total if the money was his. POPE then refused to answer more questions about the money in his possession, his finances, his claimed business, or anything else at all.

20. TFO Molyneux explained to POPE that he suspected the U.S. Currency in POPE's possession was brought to California with the intent to purchase drugs or was the proceeds of a drug transaction, and as a result the money was going to be detained based on the totality of the circumstances. POPE did not protest the seizure and did not provide any further explanation for being in possession of such a large sum of currency.

21. TFO Molyneux secured the currency in a DEA self-sealing evidence envelope, which was witnessed by TFO Maes and POPE. TFO Molyneux provided POPE with a receipt for the currency, and explained the asset forfeiture process to POPE, who appeared to understand. TFOs Molyneux and Maes provided their business contact information on the receipt and POPE signed the receipt and was given a copy. POPE also signed the DEA self-sealing evidence envelope as the owner/possessor of the currency. POPE stated he did not have any questions or anything further to add, and the interview ended at approximately 11:17 a.m., approximately 14 minutes after it began.

22. Shortly after separating from POPE, TFO Maes placed the DEA self-sealing evidence envelope containing the U.S. Currency behind a trashcan near the United Airlines luggage carousel #1 located in Terminal 3. Earlier that morning (at approximately 9:30 a.m.), TFO Molyneux had his certified drug detection canine, Mannix, examine the area around the United Airlines luggage carousel #1 and the surround area. At that time, Mannix did not alert to any drug odors in the area. At approximately 12:04 p.m., after the bag containing the currency seized from POPE had been placed behind the trashcan near luggage carousel #1, Mannix alerted to the odor of drugs when he came upon the trashcan, indicating to TFO Molyneux that the odor of narcotics was emanating from the currency.

23. TFO Molyneux maintained custody and control of the DEA currency until TFO Maes and TFO Bertolozzi transported it to Bank of America. Once there, the money in POPE's possession was counted and determined to be $36,800.00.

24. Several months later, TFO Molyneux again examined POPE's Instagram account. TFO Molyneux saw that POPE had removed the December 2013 post/photograph of a large bag filled with marijuana that had been observed by Task Force #2 investigators before the interview of POPE on October 11, 2018, and that additional photographs/posts had been added. These posts/photographs included two March 2019 photographs of POPE sitting on a kitchen counter next to a heat sealer and smoking what appears to be a marijuana cigarette. TFO Molyneux did not see any posts or photographs advertising or promoting a shirt selling business.

25. TFO Molyneux also attempted to find evidence or records relating to POPE's alleged business selling shirts. TFO Molyneux examined public records and databases such as Clear and Accurint, but was unable to locate any evidence of the existence of such a business.

## CLAIM FOR RELIEF

1. The United States incorporates by reference the allegations in paragraphs 1 through 28 as though fully set forth herein.

2. Title 21, United States Code, Section 841(a) prohibits the manufacture, distribution, or dispensing, and possession with the intent to distribute a controlled substance.

3. Title 21, United States Code, Section 846 makes it a crime to attempt or to conspire to violate Title 21, United States Code, Chapter 13, Subchapter I, including Title 21, United States Code, Sections 841(a).

4. Title 21, United States Code, Section 853 provides that any person convicted of violating (among other things) Title 21, United States Code, Sections 841(a) and 846 shall forfeit any property constituting or derived from any proceeds the person obtained, directly or indirectly, as the result of that

violation, and any of the person's property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of that offense.

5.  Title 21, United States Code, Section 881(a)(6), provides, in part, for the forfeiture of all moneys, securities or other things of value furnished or intended to be furnished to a person in exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys and securities used or intended to be used to facilitate any violation of Title 21, United States Code, Chapter 13, Subchapter I, including violations of Title 21, United States Code, Sections 841(a) and 846.

6.  In light of the foregoing, and considering the totality of the circumstances, there is probable cause to believe that the Defendant Property represents proceeds traceable to money, securities or other things of value furnished to a person in exchange for a controlled substance, or intended to do so, in violation of Title 21, United States Code, Sections 841(a) and 846, and thus subject to forfeiture under Title 21, United States Code, Sections 853 and 881(a)(6).

WHEREFORE, plaintiff United States of America requests that due process issue to enforce the forfeiture of the Defendant Property; that notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; and that judgment of forfeiture be entered; that the Court enter judgment forfeiting the Defendant Property; and that the United States be awarded such other relief as may be proper and just.

DATED: April 22, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

KAREN BEAUSEY
Assistant United States Attorney

## **VERIFICATION**

I, Drug Enforcement Administration Task Force Agent Blake Molyneux, state as follows:

1. I am a Task Force Agent with the Drug Enforcement Administration. I am a case agent assigned to this case. As such, I am familiar with the facts and the investigation leading to the filing of this Complaint for Forfeiture.

2. I have read the Complaint and believe the allegations contained therein to be true.

\* \* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20 day of April, 2019, in SAN FRANCISCO, California.

_____
Task Force Agent Blake Molyneux
Drug Enforcement Administration

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

**DEFENDANTS**
$36,800 in United States Currency

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Karen Beausey
450 Golden Gate Ave., 9th Floor
San Francisco, CA 94102

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [X] 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation–Transfer
- [ ] 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 21, United States Code, Sections 853 and 881 (a)(6)
Brief description of cause:
Drug Related Forfeiture

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   Yes   [X] No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:
JUDGE       DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*   [X] SAN FRANCISCO/OAKLAND    SAN JOSE    EUREKA-MCKINLEYVILLE

DATE 04/22/2019      SIGNATURE OF ATTORNEY OF RECORD